## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **BRIAN EUGENE HUX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. _____ |
| | ) | |
| **KNOX COUNTY, TENNESSEE,** | ) | |
| a governmental entity, | ) | **JURY DEMANDED** |
| | ) | |
| **RANDALL L. WILLIAMS,** | ) | |
| individually, and | ) | |
| | ) | |
| **JOHN and JANE DOES 1-5,** | ) | |
| individually, | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS AND DAMAGES

**NOW COMES** the Plaintiff, Brian Eugene Hux ("Plaintiff"), and files this Complaint against the Defendants, Knox County, Tennessee, a governmental entity ("County"); Knox County Sheriff's Office Deputy Randall L. Williams, individually ("Dep. Williams"); and John and Jane Does 1-5 ("Doe Defendants") (collectively, "Defendants").

Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
lance@lbakerlawfirm.com

*Attorney for the Plaintiff*
*Brian Eugine Hux*

**TABLE OF CONTENTS**

I. NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V. WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI. CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    COUNT ONE – EXCESSIVE FORCE – 42 U.S.C. §§ 1983 and 1988, Under Fourth and/or Fourteenth Amendments (Against Dep. Williams, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    COUNT TWO – WRONGFUL STOP & SEIZURE, 42 U.S.C. §§ 1983 and 1988, Under Fourth and/or Fourteenth Amendments (Against Dep. Williams, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    COUNT THREE – FAILURE TO TRAIN AND SUPERVISE – 42 U.S.C. §§ 1983 and 1988 under Fourth and/or Fourteenth Amendments (Against the County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    COUNT FOUR – BATTERY (Against the County and Dep. Williams, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    COUNT FIVE – NEGLIGENCE (Against the County and Dep. Williams, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    COUNT SIX – RECKLESS OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against Dep. Williams, Individually) . . . . . . . . 27

VII. JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VIII. PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Case 3:23-cv-00366-CLC-DCP   Document 1   Filed 10/10/23   Page 2 of 31   PageID #: 2

# I. NATURE OF ACTION

1. Brian Eugene Hux ("Mr. Hux") is a 65-year old Vietnam Era United States Air Force veteran, having enlisted at the age of 17 years old in 1974. He would eventually be honorably discharged from the Air Force for medical reasons – due to post traumatic stress disorder ("PTSD"). Mr. Hux currently receives benefits from the Veterans Administration as a 100% disabled American veteran.

2. By October 10, 2022, Mr. Hux was suffering from numerous seriously debilitating physical conditions, including severely arthritic hips (osteoarthritis), Chronic Obstructive Pulmonary Disease ("COPD") with emphysema, hypoxic respiratory failure (lack of oxygen in the blood), renal failure, myocardial infarction, a history of strokes, and he had also received a lobectomy of the lung.

3. On October 10, 2022, nearly a half century after he had served his country honorably, Mr. Hux's life would again be permanently altered by a Knox County Sheriff's Deputy's unreasonable and grossly excessive use-of-force. On that day, as Mr. Hux walked along a paved road near the University of Tennessee Medical Center ("UTMC"), Knox County Sheriff's Deputy Randall L. Williams ("Dep. Williams") spotted him, exited his cruiser to engage Mr. Hux. Although Mr. Hux's behavior was non-violent and he was unarmed, Dep. Williams inexplicably tased the feeble and unarmed veteran in the back of his head without just cause or provocation. As a taser barb penetrated Mr. Hux's head, sending 50,000 volts coursing through his body, Mr. Hux's body began violently seizing from neuromuscular incapacitation, causing him to crash hard and face-first onto the asphalt pavement.

-1-

4.       As a result of Dep. Williams's actions, Mr. Hux lost consciousness, began seizing, and suffered severe skull, facial, and cervical trauma, including numerous and significant skull and facial fractures, was treated by a UTMC trauma team, surgically stabilized, and placed in UTMC's intensive care unit.

5.       In an effort to justify his use of the taser against Mr. Hux under the circumstances, Dep. Williams immediately reported that Mr. Hux had "matched" the description of a BOLO suspect and had fled from him after Williams had exited his cruiser. Yet, the crimes for which Mr. Hux was suspected were all theft-related, and Dep. Williams's report indicates that Mr. Hux was unarmed, did not engage in threatening or assaultive behavior toward Williams (or others), and that he posed no immediate threat to Williams. At most, Mr. Hux was passively resisting Dep. Williams at the moment Williams decided to tase the frail, disabled, and decrepit Air Force veteran in the head.

6.       There is no indication that Dep. Williams considered the severity of Mr. Hux's alleged offense, Mr. Hux's threat level to others, or the risk of a serious injury to Mr. Hux before he decided to deploy his taser against Mr Hux. Nor did Dep. Williams recognize that national guidelines and standards dictate that that fleeing should not be the sole justification for using a taser against a subject. Yet, Dep. Williams's only reason for tasing Mr. Hux was his claim that the 100% disabled Air Force veteran was fleeing from him, on foot.

7.       Mr. Hux – a medium-sized, thin man, with long purple-dyed hair – looked nothing like the suspect described by Dep. Williams. Nor could Mr. Hux have posed

any serious threat to flee, much less could he have been "running away," considering his debilitating physical limitations, and the fact that he was *walking on-foot* on a public road while Williams was in *a police cruiser*.

8. A reasonable, trained, skilled, or proficient deputy in the circumstances presented to Dep. Williams would not have believed the force Williams used – tasing Mr. Hux in the back of the head, despite the likelihood that his body would seize and make him crash onto the pavement – was necessary, or that it was measured or patterned for the circumstances presented.

9. Under national standards, law enforcement departments that utilize tasers should provide officers comprehensive training on when and how to use them. The County's and Knox County Sheriff Tom Spangler's failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use of tasers and to properly train officers to adhere to such guidelines constitute deliberate indifference to the constitutional rights of citizens. Here, the dangerous and unconstitutional consequences of failing to train Dep. Williams in the reasonable use of tasers are so patently obvious that Knox County is liable under 42 U.S.C. § 1983. This lack of training deprived Dep. Williams of the tools to allow him to safely handle the situation that confronted him. Consequently, Williams wound up escalating a routine situation and needlessly causing a citizen to suffer serious, permanent, and disabling injuries.

10. Upon information and belief, Dep. Williams's supervisors and ultimately, Sheriff Spangler, ratified Williams's unreasonable use-of-force against Mr. Hux by

-3-

taking no disciplinary action against Dep. Williams and signing off on his wrongful and egregious actions as conforming to Knox County's taser policy. Sheriff Spangler thus knowingly acquiesced in the unconstitutional conduct of Dep. Williams through the execution of his job functions, and in doing so, rendered Knox County liable to Mr. Hux. The failure of Sheriff Spangler and supervisors to recognize Dep. Williams's unconstitutional actions implies that they, too, found no wrong in his conduct and "green lit" future Fourth Amendment violations by County deputies. Here, Dep. Williams believed that his unconstitutional actions would not be properly monitored or corrected by his supervisors and that his misconduct would be tolerated and accepted. His belief was prescient.

11. Defendants, acting under color of law, deprived Mr. Hux of his constitutional rights under the Fourth and/or Fourteenth Amendments. By this action, brought under 42 U.S.C. § 1983 and Tennessee common law, Mr. Hux makes the following claims:

- Count One – 42 U.S.C. § 1983 – excessive use-of-force by Dep. Williams, individually;

- Count Two – 42 U.S.C. § 1983 – failure of the County to properly train and supervise officers with respect to the safe, lawful, and constitutional use of tasers;

- Count Three – battery by the County and Dep. Williams, individually;

- Count Four – negligence by the County and Dep. Williams, individually; and

-4-

- Count Five – negligent, reckless, or intentional infliction of emotional distress by Dep. Williams, individually.

12. Mr. Hux seeks all compensatory damages available, including, but not limited to, damages for (a) bodily injury, (b) excruciating physical pain and suffering; and (c) severe emotional suffering, mental anguish, humiliation, despair, and hopelessness.

13. Mr. Hux further requests punitive damages against Dep. Williams, as well as attorney's fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

14. This civil action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution, and for violations of related Tennessee common law torts. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

15. This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

16. Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Knox County, within the Northern Division of the Eastern District of Tennessee.

-5-

### III.  PARTIES

**A.  Plaintiff**

17.  At all times material, Brian Eugene Hux ("Mr. Hux" or "Plaintiff") was a citizen and resident of Knox County.

**B.  Defendants**

18.  Defendant, Knox County ("County") is a governmental entity and political subdivision of the State of Tennessee, duly organized. It may be served through its chief executive officer, Knox County Mayor Glenn Jacobs, at the Mayor's Office, City County Building, Suite 615, 400 Main Street, Knoxville, TN 37902. The County possesses the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual members of the Knox County Sheriff's Office ("KCSO"), and to assure that actions, policies, rules, regulations, practices and procedures of the KCSO and its employees comply with the laws and constitutions of the United States and Tennessee.

19.  The County is responsible for training and certifying its law enforcement employees and implementing procedures and protocols to honor and respect the Due Process rights of citizens with whom its law enforcement employees interact.

20.  In this case, the County and the KCSO acted through their agents, employees, and servants, including policymakers like Sheriff Tom Spangler ("Sheriff Spangler"). At all times material hereto, Sheriff Spangler was operating under color of law.

-6-

21. At all times material hereto, Sheriff Spangler was the duly elected County Sheriff, responsible for the screening, hiring, firing, training and the supervision of KCSO employees.

22. At all times material hereto, Sheriff Spangler also possessed the power and authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the use of force, including the use of tasers and other force-options, by KCSO deputies.

23. At all material times, Dep. Randall L. Williams ("Dep. Williams") was employed by the KCSO as a deputy. Williams is sued in his individual capacity and as principal on his official bond. At all relevant times, Dep. Williams was operating under color of law. Dep. Williams is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

24. Plaintiff also sues fictitious Defendants, referred to herein as John and Jane Does 1-5, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are also sued in their individual capacities as KCSO employees or deputies, and as principals on their official bonds, if any.[1]

---

[1]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff may seek leave of Court to amend his Complaint to set forth the true names and capacities of such Defendants once their identities are ascertained.

25. Various persons not made Defendants, including County or KCSO officials, have participated in violations asserted herein and performed acts or made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as Defendants, as they become known.

## IV. FACTUAL ALLEGATIONS

26. In 1974, 17-year old Brian Eugene Hux enlisted in the United States Air Force ("USAF"). After basic training, Mr. Hux was eventually assigned to Seymour Johnson Air Force Base in Goldsboro, North Carolina, where he assisted in maintaining and ground-maneuvering McDonnell-Douglas F-4 Phantom II fighter jets.

27. A year after his enlistment, Mr. Hux was medically discharged from the Air Force, receiving, by law, an honorable discharge. Mr. Hux is now a 100% disabled USAF veteran, living off his veteran's benefits and Social Security. He also fathered two daughters, one of whom is recently deceased.

28. At approximately 4:18 p.m. on October 10, 2022, Dep. Williams was patrolling in South Knox County, at Edington Road near Cherokee Trail, when he spotted Plaintiff, Brian Eugene Hux ("Mr. Hux"), walking along Edington Road.

29. According to Dep. Williams, Mr. Hux matched the description of a person identified in a recent "be on the lookout" ("BOLO") alert, *i.e.*, a "tall white male with brown hair," who had reportedly left the University of Tennessee Medical Center, located "nearby." The BOLO targeted a man who had "outstanding warrants."

30. Mr. Hux's physical appearance was distinctive. He was white, about 5' 9" tall, and slim, weighing about 150 pounds, had a beard and mustache, and long hair

-8-

that he had dyed *purple*. *See* JIMS Rept., KCSO Photo. Nevertheless, Dep. Williams claimed that Mr. Hux "matched" the description of the BOLO subject and so, he "initiated" the "emergency lights" in his cruiser and "attempted to make contact."

31. Dep. Williams next claims in his report that Mr. Hux "fled on foot" and that he then "gave chase and deployed [his] taser." Williams reported that his taser deployment "was effective and [Mr. Hux] fell to the ground," with his face striking the pavement.

32. With Mr. Hux on the pavement bleeding and unconscious, Dep. Williams radioed for an ambulance, which arrived and transported Mr. Hux to UTMC emergency room. In his official report, Williams stated that Mr. Hux had suffered "minor injuries."

33. But Dep. Williams' version of the incident is largely fiction, beginning with his very reason for stopping Mr. Hux in the first place. Williams was purportedly looking for a "tall" white man with "brown" hair. While Mr. Hux is white, at 5' 9", he is hardly "tall." And Mr. Hux's hair was not brown, but distinctly dyed *purple*. Thus, by any fair or reasonable account, contrary to Dep. Williams's report, Mr. Hux did not "match" the description of the man sought be the BOLO alert.

34. More than all this, Mr. Hux's physical disabilities seriously undermine Dep. Williams' claim that Mr. Hux was "fleeing" or that he "ran" away from him. Specifically, Mr. Hux suffers from numerous debilitating physical conditions that prevent him from moving as Dep. Williams described. For instance, Mr. Hux has severely arthritic hips (osteoarthritis); suffers from Chronic Obstructive Pulmonary

-9-

Disease ("COPD") with emphysema, hypoxic respiratory failure, renal failure, and severely impaired vision. Mr. Hux also has a history of strokes, myocardial infarction, atherosclerosis (thickening or hardening of the arteries), Syncope (feinting), and has had a lobectomy of the lung. In other words, Mr. Hux – suspected by Dep. Williams to have been hospitalized hours earlier for chest pain – could not have reasonably been viewed as "actively resisting" or "running away," much less as a "serious threat" to "flee." Simply put, Mr. Hux's various medical conditions prevent him from "running."

35. Nor was Mr. Hux a physical threat to Dep. Williams. Not only was Mr. Hux unarmed, but there is no indication by Dep. Williams's report that Mr. Hux posed any "immediate threat" whatsoever to Williams' safety or to the safety of others. By all accounts, Mr. Hux made no attempt to physically resist, harm, hit, or otherwise assault Dep. Williams at any point during the incident.

36. According to Dep. Williams, the BOLO suspect he sought was wanted for an "outstanding warrant" for theft in Sullivan County, not a particularly serious offense.

37. As a result of Dep. Williams's tasing him under the circumstances, Mr. Hux's medical records from UTMC show that he suffered severe and life-threatening injuries, including an "intracranial hemorrhage and skull base fracture with associated narrowing of the basilar artery."

38. On arrival at UTMC, Mr. Hux was unresponsive and unarousable and was found to have numerous abrasions and lacerations involving the head and face and multiple severe head and facial trauma.

-10-

39. A taser barb was removed by the UTMC trauma team from the left side of Mr. Hux's head. He seized violently in the emergency room and was admitted to the trauma ICU, where he had to be intubated and treated by a full alert trauma team. Specifically, Mr. Hux suffered the following injuries as a result of Dep. Williams' unlawful tasing:

- Subdural hematoma;
- Subarachnoid hemorrhage;
- Contusion of frontal lobe;
- C-5 pedicle fracture;
- Fracture of spinous process of cervical vertebra;
- LeFort I fracture (floating palate);
- LeFort II fracture (floating maxilla);
- Nasal bone fractures;
- Orbital roof fracture;
- Frontal skull fracture;
- Fracture of skull base;
- Fracture of sphenoid bone (skull);
- Fracture of clivus of occipital bone (cranium);
- Aspiration pneumonia;
- Respiratory failure; and
- Seizure

40. Other than walking away from UTMC, Mr. Hux has no memory of the incident.

41. In addition to all the serious physical and mental injuries inflicted as a result of the unnecessary and unreasonable tasing, Mr. Hux's life has been permanently altered by the incident, as he was placed in a residential facility, no longer able to live independently.

42. Along with his physical, emotional, and mental injuries, Mr. Hux's older model Porsche Cayene, valued at $4,000, which he had been operating earlier that day,

-11-

was also impounded by the KCSO. While Mr. Hux was hospitalized and recovering, the KCSO sold the vehicle at auction.

## V.  WAIVER OF IMMUNITY

43.  The County has waived immunity for its own negligence and for its employees, misconduct of officers acting under color of law, and for the negligence of deputies, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI.  CLAIMS FOR RELIEF

### COUNT ONE

### EXCESSIVE FORCE

**42 U.S.C. §§ 1983 and 1988**
**Under Fourth and/or Fourteenth Amendments**

### (Against Dep. Williams, Individually)

44.  The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

45.  According to Dep. Williams, he saw Mr. Hux walking along a paved road near UTMC and decided to stop and question him, purportedly to determine if he was a BOLO suspect. Dep. Williams allegedly initiated the emergency lights in his cruiser and exited the vehicle. By Williams's account, Mr. Hux then fled, and he tased him, causing Mr. Hux to fall, at which time, Williams states, Mr. Hux suffered "minor injuries."

-12-

46.     But based upon Dep. Williams's own account, other than tasing him, he made no effort – *none* – to convince Mr. Hux to stop. Dep. Williams had a variety of force-options available to him for situations when a subject is passively resistant, actively resistant, and/or actively aggressive. Yet, Dep. Williams did not attempt – much less exhaust – any other reasonable means of apprehension.

47.     For example, if verbal commands alone were ineffective, Dep. Williams had the following force options available to him:

- "Empty Hand Hard" – strikes, kicks, leg-sweeps, trips, tackles and bilateral neck restraints to effect control of the resisting subject;

- "Empty Hand Soft" techniques – empty hand escort controls, pressure points, come-a-longs, and directional controls that have a minimal chance of inflicting injury;

- Oleoresin Capsicum (OC) Spray (pepper-spray);

- Baton;

- TASER; and

- Bilateral neck restraint/shoulder pins

48.     Instead of verbal or other less dangerous options, immediately after stopping his cruiser to stop and question Mr. Hux, Dep. Williams quickly decided to escalate the situation into a physical confrontation by tasing Mr. Hux from behind in the head.

-13-

49. When Dep. Williams tased Mr. Hux, Williams had not yet attempted any other means of apprehension. The taser was the first and the only means used by Williams to apprehend Mr. Hux.

*Tasers*

50. A taser is a battery-powered, handheld device which delivers a short, low-energy electrical pulse. Two electrode wires are attached to the gun's electrical circuit. Pulling the trigger breaks open a compressed gas cartridge inside the gun and flings the electrodes into contact with a body and a charge flows into the muscles.

51. The taser delivers 19 short pulses per second over 5 seconds, with an average current of 2 milliamps, according to TASER manufacturer Axon. It creates an electric field, which stimulates nerve cells called alpha motor neurons to send an electrical impulse. The impulse travels to muscles and causes short, sustained muscle contractions.

52. The taser has two modes: the first, pulse mode, causes neuromuscular incapacitation as the neural signals that control muscles become uncoordinated, and muscles contract at random. The second mode, drive-stun, uses pain to get compliance.

53. According to Axon's marketing materials, upon firing, the taser emits 2 probe-darts attached to insulated conductive wires that travel up to 25 feet to reach their target. For example, the commonly used X26P delivers an electric pulse to the target, which overrides the sensory and motor functions of the central nervous system. A single trigger pull and release discharges an electrical charge for a 5-second cycle. Once a cartridge is fired, the operator can re-energize it by pulling the trigger.

-14-

54. Other guidelines advise officers to weigh a suspect's size, age, and "apparent ability to physically endanger the officer or do harm to oneself or others, balanced against the seriousness of the incident."

55. Tasers are considered Electronic Controlled Weapons ("ECW") and are a less-lethal, intermediate weapon of force due to their capacity to cause serious harm and even death. The U.S. Dept. of Justice has developed standards for the use of tasers by law enforcement officers. *See* 2011, Electronic Control Weapons Guidelines (a joint project of the USDOJ and the Police Executive Research Forum). Those national guidelines provide that tasers, like other ECWs, should be used as a weapon of need, not a tool of convenience.

56. National standards also provide that when feasible, officers should use non-force options before using a taser or other force options. Officers should not over-rely on tasers or other ECWs in situations where more effective and less risky alternatives are available. Moreover, law enforcement departments that utilize tasers should provide officers comprehensive training on when and how to use them. [ECW Guidelines, 11-12].

57. A number of populations are believed to be at a heightened risk for serious injury or death following a taser or other ECW application. Those include visibly frail persons or persons with a slight build, persons with known heart conditions, and persons in medical/mental crisis. The national guidelines also provide that law enforcement personnel should be trained about the medical complications that may occur after taser or other ECW use and that they should be made aware that certain

-15-

individuals may be at a heightened risk for serious injury or death when subjected to taser or other ECW application or other uses of force to subdue them. [ECW Guidelines, 14].

58.     The national guidelines further provide that a warning should be given to a subject prior to activating the taser unless doing so would place any person at risk. Warnings may be in the form of verbalization, display, laser painting, arcing, or a combination of these tactics. [ECW Guidelines, 20].

59.     National guidelines provide that tasers and other ECWs should be used only against subjects who are "exhibiting active aggression" or who are "actively resisting" in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others. ECWs should not be used against a passive subject. [ECW Guidelines, 20].

60.     National guidelines also state that fleeing should not be the sole justification for using an ECW against a subject. Rather, law enforcers should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use a taser or other ECW on a fleeing subject. [ECW Guidelines, 20].

61.     Nor should law enforcement personnel intentionally target sensitive areas (*e.g.*, head, neck, genitalia), except when lethal force would be permitted, or when the officer has reasonable cause to believe there is an imminent risk of serious physical injury to the officer or others. [ECW Guidelines, 20].

-16-

62. Officers must also consider environmental hazards when deploying a taser.

*Dep. Williams's Unconstitutional Use of His Taser on Mr. Hux*

63. Before deploying his taser against Mr. Hux, Dep. Williams did not weigh Mr. Hux's size, age, and apparent ability to physically endanger" him or do harm to himself or others, much less balance those circumstances against the seriousness of the charges against Mr. Hux. Dep. Williams also had to have realized that Mr. Hux was a person of heightened risk for serious injury or death when he tased him. After all, not only was Mr. Hux visibly frail and of slight build, but he also had a heart condition, for which he had been hospitalized earlier in the day. Upon information and belief, Dep. Williams knew that another KCSO deputy had taken Mr. Hux to UTMC for "chest pains" just hours earlier.

64. Dep. Williams's report does not indicate that he gave Mr. Hux a warning – verbalization, display, laser painting, arcing, or a combination of these tactics – prior to activating the taser. Nor does he suggest that doing so would have placed him or any other person at risk.

65. The circumstances described by Dep. Williams indicate that Dep. Williams appears to have deployed his taser as a mere tool of convenience, not necessity. However, under national standards, Dep. Williams was first obligated to use any available non-force options before using a taser or other force options. Yet, Dep. Williams deployed his taser, notwithstanding the availability of more effective and less risky alternatives, identified above.

-17-

66.   Although national guidelines provide that tasers should be used only against subjects who are "exhibiting active aggression" or who are "actively resisting" in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others, in walking along a road, Mr. Hux was neither "actively aggressive" toward Dep. Williams nor "actively resisting" Williams when he was tased. To the extent Dep. Williams suggests that Mr. Hux was fleeing or running away, Mr. Hux's physical disabilities make it highly unlikely that he could have run or escaped Dep. Williams, if pursued.

67.   By Dep. Williams's account in his report, his only reason for tasing Mr. Hux was that Mr. Hux was fleeing. Putting aside the fact that Mr. Hux's physical disabilities make it highly unlikely that he could have run – or at least outrun – an active duty  Sheriff's Deputy who was decades younger and presumably much better shape than him, under national guidelines for taser use, fleeing should not be the sole justification for using a taser against a subject.

68.   Perhaps Dep. Williams's most careless and dangerous decision of all was his decision to tase Mr. Hux as he walked along the paved road, knowing that if the taser was effective, Mr. Hux would experience neuro-muscular incapacitation, his body would seize, and he would inevitably fall to the ground without any ability to cushion the fall.

69.   In addition to all of this, Dep. Williams also tased Mr. Hux in the head. National standards specifically warn officers not to target sensitive areas (*e.g.*, head, neck, genitalia) on a subject's body, except when lethal force would be permitted, or

-18-

when the officer has reasonable cause to believe there is an imminent risk of serious physical injury to the officer or others, neither of which applied in this instance.

70. No reasonable officer under the circumstances would have believed that the use of a taser against Mr. Hux was lawful. Dep. Williams lacked probable cause or reasonable suspicion to believe Mr. Hux posed an imminent danger to him (or to others). Even if some force were constitutionally reasonable, the degree of force used here was clearly excessive and unconstitutionally disproportionate in degree to the circumstances.

71. Dep. Williams's use of force in tasing Mr. Hux was legally unjustified and objectively unreasonable and violated Mr. Hux's rights to be free of unreasonable seizure and use of excessive force under the Fourth Amendment. *See, e.g., Graham v. O'Connor*, 490 U.S. 386, 396 (1989). This right to be free of the use of objectively unreasonable force was also clearly established at the time.

72. The violations of Mr. Hux's Fourth Amendment rights by Dep. Williams directly and proximately caused Mr. Hux to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish. Furthermore, Dep. Williams's conduct was also willful, wanton, malicious, and done with reckless disregard for Mr. Hux's federally-protected rights, justifying an award of punitive damages against him so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

73. Mr. Hux sues Dep. Williams for violating his constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

### WRONGFUL STOP & SEIZURE/
### LACK OF PROBABLE CAUSE TO DETAIN

### 42 U.S.C. §§ 1983 and 1988
### Under Fourth and/or Fourteenth Amendments

### (Against Dep. Williams, Individually)

74. The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

75. Mr. Hux had a clearly established right not to be stopped absent a reasonable suspicion of criminal activity. He also had a clearly established right not to be searched, seized, and detained by without probable cause.

76. Dep. Williams initiated his emergency lights to stop and question Mr. Hux after observing him walking along a road near UTMC. Williams claimed that Mr. Hux matched the description of a BOLO suspect. According to Williams, the suspect was a tall male with brown hair. Mr. Hux is only 5' 9" and had dyed *purple* hair.

77. Dep. Williams's stop of Mr. Hux and subsequent seizure was constitutionally unreasonable.

-20-

78.     At the moment Dep. Williams stopped Mr. Hux on the road, Williams had no credible information, reasonable suspicion, or other justification to believe Mr. Hux – who, by any reasonable account, did not match the description of the BOLO suspect – had engaged in any criminal, unlawful, or otherwise wrongful conduct.

79.     Nor did Dep. Williams witness Mr. Hux engage in any criminal activity or wrongful conduct prior to stopping and seizing him.

80.     Dep. Williams has not pointed to any specific and articulable facts which, taken together with rational inferences from those facts, might reasonably warrant a belief or suspicion that Mr. Hux was suspected of a crime or other wrongdoing.

81.     As a result of the foregoing actions, Mr. Hux was injured.

82.     Mr. Hux sues Dep. Williams for violating his constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT THREE

## FAILURE TO TRAIN AND SUPERVISE

**42 U.S.C. §§ 1983 and 1988
Under Fourth and/or Fourteenth Amendments**

**(Against Knox County)**

83.     The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

-21-

84. Sheriff Spangler has final authority and makes policy for the KCSO in establishing and implementing policies and/or procedures with respect to the use of force by deputies against inmates and the legal limits of such activities for deputies employed by the KCSO.

85. Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of force – the use of tasers – are so patently obvious that the County and Sheriff Spangler are liable under § 1983. The actions of Dep. Williams – unnecessarily tasing Mr. Hux, when he offered only passive resistance, if any, due to physical inability to run from or escape from the much younger and healthy deputy – demonstrate obvious and egregious training and supervisory deficiencies, making the KCSO's use-of-force and/or taser training constitutionally defective.

86. Upon information and belief, as final policymaker for the KCSO, Sheriff Spangler established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding the use of force by KCSO deputies, including the use of tasers, which policies and procedures themselves violate federal constitutional law.

87. And even if the formal policies and procedures of the KCSO are not themselves unlawful, alternatively, the operation of such policies and procedures reflects a standard operating procedure authorizing KCSO deputies to violate the federally-protected rights of suspects, as described herein.

88. The response by Sheriff Spangler and the County to such constitutional violations has been inadequate. These include but are not limited to:

- the lack of or inadequate mechanism for identifying or tracking unconstitutional uses of force, including tasers;

- the lack of or inadequate documentation of individual uses of force, including tasers, and the justification for such;

- the lack of or inadequate supervisory review of individual uses of force, including tasers, and the justification for such;

- the lack of or inadequate mechanism for monitoring or tracking uses of force, including tasers;

- the lack of or inadequate investigation of complaints of improper uses of force, including the use of tasers;

- the lack of or inadequate training regarding the legal limitations on the permissible use of force, including the use of tasers; and

- the lack of or inadequate discipline of individual officers found to have committed unlawful uses of force, including the use of tasers.

89. Violations of constitutional rights of the type inflicted on Mr. Hux, specifically the use of excessive force via taser, are the known or obvious consequences of formal KCSO policies and procedures that violate federal law, to which Sheriff Spangler and the County have acquiesced or have tacitly authorized. The actions and omissions of Sheriff Spangler and the County, as identified herein, reflect their deliberate indifference to such known or obvious consequences.

90. Such violations, as condoned by Sheriff Spangler and the County, were the moving force behind – and directly and proximately caused – the violations of Mr. Hux's constitutional rights; and render the County liable.

-23-

91. The County, KCSO, and Sheriff Spangler had a duty of care to ensure that KCSO deputies were properly trained in the appropriate procedure for using force, including using a taser. This duty extends to ensuring that KCSO officers were properly trained concerning the limits of their authority to use such force.

92. The County, KCSO, and Sheriff Spangler also had a duty to properly supervise KCSO officers and ensure KCSO supervisory officers did not condone the unnecessary uses of force, including the use of tasers. This is especially true when there is (a) a "likelihood that [a] situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Officers must have specific training to be equipped to properly react to situations, as in this case, without unnecessarily escalating them to force situations.

93. In this case, Dep. Williams lacked the tools that the County, KCSO, and Sheriff Spangler should have provided him to safely handle such a recurring situation. Consequently, he unnecessarily escalated the level of force, over what began as a routine investigative stop.

94. By failing to conduct a meaningful investigation of Dep. Williams's actions, Sheriff Spangler let it be known that he condoned the unreasonable use of the taser on suspects.

95. By ratifying the unreasonable use-of-force, Sheriff Spangler knowingly acquiesced in the unconstitutional conduct of Dep. Williams through the execution of his job function, rendering the County liable.

-24-

96.     As a direct and proximate result of the actions/omissions of the County, KCSO, and Sheriff Spangler causing the violation of his Fourth Amendment rights, Mr. Hux suffered (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish.

97.     Mr. Hux sues the County for violating his constitutional rights, and seeks any and all damages allowable, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT FOUR

## BATTERY

### (Against the County and Dep. Williams, Individually)

98.     The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

99.     The unreasonable tasing of Mr. Hux by Dep. Williams, acting under color of law, constitutes a battery.

100.    As a direct and proximate result of the unreasonable actions of Dep. Williams, Mr. Hux suffered disabling bodily injuries, severe pain and suffering, and emotional distress. He had no legal justification for using such unreasonable force against Mr. Hux. As such, the tasing of Mr. Hux constituted a battery under Tennessee law.

101.    The foregoing acts proximately caused the injuries to Mr. Hux, entitling him to recover compensatory damages from the County and Dep. Williams. Said

-25-

damages include, but are not limited to, Mr. Hux's disabling injuries, the tremendous pain and suffering he endured, and severe emotional distress.

102. The conduct of Dep. Williams was malicious, wanton, oppressive, and accomplished with a conscious disregard for Mr. Hux's rights, entitling him to an award of punitive damages.

**COUNT FIVE**

**NEGLIGENCE**

**(Against the County and Dep. Williams, Individually)**

103. The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

104. Defendants had a duty to Mr. Hux to act with ordinary care and prudence so as not to cause him harm or injury.

105. The actions of Defendants were negligent and reckless.

106. Defendants owed a duty to the public in general and specifically to Mr. Hux to use due care in fulfilling their duties and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards. As described above, Defendants breached their duties of due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

-26-

107.   Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Mr. Hux a duty of care to be free from excessive force, to protect him the negligent use of the taser, and to protect him from serious injury.

108.   As a direct and proximate result of Defendants' conduct, as alleged above, Mr. Hux was caused to suffer bodily injuries and severe pain and suffering.

109.   The foregoing acts of the Defendants proximately caused the injuries to Mr. Hux, entitling him to recover compensatory damages from Defendants for such damages. Said damages include, but are not limited to, disabling bodily injuries, tremendous pain and suffering, and severe emotional distress.

## COUNT SIX

## RECKLESS OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Against Williams, Individually)

110.   The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-13 and 26-42, are hereby incorporated by reference, as if set forth verbatim.

111.   The actions alleged above against Dep. Williams were outrageous and utterly intolerable in a civilized society, and were done with reckless or intentional disregard of the probability of causing severe emotional distress.

112.   Dep. Williams unnecessarily and unreasonably escalated a simple investigative stop of a 100% disabled American veteran into a situation involving a serious and dangerous risk to Mr. Hux, culminating in him being unnecessarily tased

-27-

and predictably falling face-first onto the asphalt paved road, where he suffered extensive and severe injuries to his skull, face, and back, and other bodily harm, permanently altering his life.

113. Dep. Williams's conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, severe mental anguish on Mr. Hux. By reason thereof, Mr. Hux claims compensatory damages of $1,000,000, as well as punitive damages of $2,000,000 (or in an amount to be proven at trial) sufficient to punish and deter Dep. Williams and others in similarly situated positions of authority from engaging in similar conduct in the future.

## VII.  JURY DEMAND

114. Pursuant to Federal Rule of Civil Procedure 38(b), Mr. Hux demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A. That Defendants be served with a copy of this Complaint and be required to answer;

B. That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C. That Plaintiff be awarded such damages as will fully compensate him for all injuries proximately caused by Defendants' actions and that a judgment in his favor be entered;

D. That Plaintiff be awarded $1,000,000 in compensatory damages;

-28-

E.      That Plaintiff be awarded $2,000,000 in punitive damages;

F.      That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.      That Plaintiff be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 10th day of October, 2023.

*/s/ Lance K. Baker*
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

*Attorney for Plaintiff*

-29-